

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-26-2007

# Lavira v. Atty Gen USA

Precedential or Non-Precedential: Precedential

Docket No. 05-3334

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"Lavira v. Atty Gen USA" (2007). *2007 Decisions.* Paper 1535.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/1535

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL


UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

NO. 05-3334
_____


MAURICE LAVIRA,

Petitioner

v.

ATTORNEY GENERAL OF THE UNITED STATES,

Respondent


_____


Petition for Review of an Order of the
United States Department of Justice
Board of Immigration Appeals
BIA No. A72-550-331
Immigration Judge:  Grace Sease

_____

Argued on September 28, 2006

Before:  RENDELL, ROTH, AND GIBSON*, Circuit Judges,

(Filed February 26, 2007)

Valerie A. Burch    **[ARGUED]**
Pennsylvania Immigration Resource Center
50 Mount Zion Road
York, PA   17402
*Counsel for Petitioner*
*Maurice Lavira*

Ethan B. Kanter
James E. Grimes
William C. Minick    **[ARGUED]**
United States Department of Justice
Office of Immigration Litigation
P. O. Box 878
Ben Franklin Station
Washington, DC   20044

*Counsel for Respondent*
*Attorney General of the United States*

_____

&ast;  Honorable John R. Gibson, Judge of the United States
Court of Appeals for the Eighth Circuit, sitting by
designation.

## OPINION OF THE COURT

RENDELL, Circuit Judge.

Maurice Lavira is an above-the-knee amputee with a lifelong political affiliation with exiled former President Jean-Bertrand Aristide of Haiti. He is also HIV positive. Lavira has been in the United States since 1993. He petitions for review of the decision of the Immigration Judge ("IJ"), affirmed by the Board of Immigration Appeals ("BIA"), that his conviction for purchasing a $10 bag of drugs for an undercover agent was a "particularly serious crime" under the terms of the Immigration and Nationality Act ("INA"). In addition, Lavira claims that the IJ failed to recognize the basis for his claim under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"), as implemented by the Foreign Affairs Reform and Restructuring Act ("FARRA"), Pub. L. No. 105-277, Div. G, Title XXII, § 2242, 112 Stat. 2681-822 (Oct. 21, 1998) (codified as Note to 8 U.S.C. § 1231), and the Department of Justice's corresponding regulations at 8 C.F.R. §§ 208.16-208.18. Lavira argues that his removal to Haiti would violate the CAT in that placing him in the inhumane conditions of the Haiti detention center (an airless, disease-ridden facility that this Court has likened to a "slave ship," *Auguste v. Ridge*, 395 F.3d 123, 129

3

(3d Cir. 2005)) would more likely than not subject him to severe pain and suffering, and that he would be singled out for abuse and mistreatment by the guards given, among other characteristics, his HIV status.[1] We will remand to the agency for further proceedings.

## I. Factual and Procedural History

Born in Haiti on January 1, 1970, Lavira had his leg and ear cut off in a car accident.[2] Lavira lost fingers in Haiti while repairing a truck. Lavira had little contact with his mother growing up and when he was 16 his father was killed. He found refuge at a church in Port-au-Prince where Jean-Bertrand Aristide preached. Aristide permitted Lavira to stay at the church, and Lavira did so for two years until the church was

---

[1] If the IJ committed legal error in concluding that his drug offense was a "particularly serious crime," Lavira would then be eligible for withholding of removal. Whether or not he succeeds on that claim, Lavira may be eligible for deferral of removal if he prevails on his second claim, namely, that the IJ erred as a matter of law in denying his Convention Against Torture (CAT) claim.

[2] While Lavira contends that he lost his leg and ear when "anti-Aristide thugs attacked him with a machete for supporting the exiled President of Haiti," Appellant's brief "does not dispute the facts found by the IJ, nor does it rely upon information found unreliable by the IJ."

burned down by Aristide opponents. Lavira was an open Aristide supporter in 1990 when Aristide ran for and won election as President of Haiti. At roughly the same time as Aristide was ousted from Haiti in a military coup, Lavira left Haiti for the United States on a boat and was picked up by the U.S. Marines. The then-INS detained him for more than a year, then released him "for humanitarian reasons," according to Lavira.

Believing that he had been granted permanent asylum, Lavira sought no new immigration status after being released. He became depressed and by 1996 was homeless and a drug addict. In 1998, Lavira pled guilty to a charge of Attempted Criminal Sale of a Controlled Substance in the Third Degree, N.Y.P.L. § 110/220.39, as a result of his having accepted $10 from an undercover officer in order to obtain crack cocaine for the officer.[3] In July 2003, Lavira was taken into custody by the Department of Homeland Security ("DHS").

In November 2003, the IJ ordered that Lavira be removed to Haiti in light of his drug conviction. Unable to write or speak

---

[3] Lavira also pled guilty in 2002 to a charge of Criminal Facilitation in the Fourth Degree, N.Y.P.L. § 115.00. Lavira had purchased three small baggies of crack cocaine from an undercover officer. Lavira served roughly 18 months in New York state prisons for these offenses. The record is clear, however, that the only conviction used as a basis for deporting Lavira was the attempted sale conviction. A.R. 952.

English, Lavira appealed *pro se* to the BIA. The BIA sustained the appeal and remanded the case to the IJ, finding that Lavira's opportunity to make claims for withholding of removal under the INA and the CAT had been improperly limited by the IJ. In the remand order, the BIA instructed the IJ to consider the circumstances surrounding Lavira's drug trafficking crime in order to determine whether Lavira had in fact been convicted of a "particularly serious crime." The remand also ordered that Lavira be permitted to "flesh out" his fear of returning to Haiti, as the opportunity to do so at the removal hearing was limited. Appx. 31.

Thereafter venue was changed to the York Immigration Court in Pennsylvania, and Lavira received free counsel pursuant to 8 C.F.R. § 292.1(a)(2). He applied for withholding of removal to Haiti under 8 U.S.C. § 1231(b)(3), withholding of removal under the CAT, 8 C.F.R. § 208.16, and deferral of removal to Haiti under the CAT, 8 C.F.R. § 208.17. After several hearings over the course of six months, the IJ denied all of Lavira's claims, concluding that Lavira had committed a particularly serious crime and that he was not eligible for deferral of removal to Haiti because he had leveled only a generalized attack on the conditions of the Haitian facility.

### A. "Particularly Serious Crime"

Individuals seeking to obtain withholding of removal may not do so if they are deemed by the Attorney General to have committed a particularly serious crime. 8 U.S.C. § 1231(b)(3)(ii) (person not removable if the Attorney General decides that "the alien, having been convicted by a final judgment of a particularly serious crime is a danger to the community of the United States"). The statute gives guidance as to the meaning of this term:

> For purposes of clause (ii), an alien who has been convicted of an aggravated felony (or felonies) for which the alien has been sentenced to an aggregate term of imprisonment of at least 5 years shall be considered to have committed a particularly serious crime. The previous sentence shall not preclude the Attorney General from determining that, notwithstanding the length of sentence imposed, an alien has been convicted of a particularly serious crime.

8 U.S.C. § 1231(b)(3)(iv).

Although Lavira committed a drug trafficking offense, a crime that he concedes is an aggravated felony, he did not receive a sentence in excess of five years. Thus, it was left up to the Attorney General to determine whether the crime was a

7

"particularly serious crime." We have jurisdiction to decide whether the Attorney General's determination is correct. *Alaka v. Gonzales*, 456 F.3d 88, 104 (3d Cir. 2006) ("We thus have jurisdiction over whether the IJ misapplied the law in determining whether Alaka's bank fraud conviction was 'particularly serious.'").[4]

Under *Matter of Y-L-*, 23 I. & N. Dec. 270 (BIA 2002), the BIA opined that the presumption is that a drug trafficking crime is a "particularly serious crime." That presumption can be overcome, however, if the offense is a drug trafficking crime but nevertheless "fall[s] short of that standard." *Matter of Y-L-*, 23 I. & N. at 276-77. The BIA in that case described the proper analysis:

> I might be well within my discretion to conclude that all drug trafficking offenses are per se 'particularly serious crimes' under the INA. I do not consider it necessary, however, to exclude entirely the possibility of the very rare case where an alien may be able to demonstrate extraordinary and compelling circumstances that justify treating a particular drug trafficking crime as falling short of that standard. While this opinion does not

---

[4]Respondent initially claimed that the Attorney General's determination was unreviewable, but rescinded that argument by letter in light of *Alaka*.

afford the occasion to define the precise boundaries of what those unusual circumstances would be, they would need to include, at a minimum: (1) a very small quantity of controlled substance; (2) a very modest amount of money paid for the drugs in the offending transaction; (3) merely peripheral involvement by the alien in the criminal activity, transaction, or conspiracy; (4) the absence of any violence or threat of violence, implicit or otherwise, associated with the offense; (5) the absence of any organized crime or terrorist organization involvement, direct or indirect, in relation to the offending activity; and (6) the absence of any adverse or harmful effect of the activity or transaction on juveniles. Only if all of these criteria were demonstrated by an alien would it be appropriate to consider whether other, more unusual circumstances (e.g., the prospective distribution was solely for social purposes, rather than for profit) might justify departure from the default interpretation that drug trafficking felonies are 'particularly serious crimes.' I emphasize here that such commonplace circumstances as cooperation with law enforcement authorities, limited criminal histories, downward departures at sentencing, and post-arrest (let alone post-conviction) claims of

9

contrition or innocence do not justify such a deviation.

*Id.*[5]

In a hearing that took place several weeks before the IJ rendered her ultimate decision on the particularly serious crime question, the IJ indicated that she understood that *Matter of Y-L-* set forth the correct standard. At the same time, however, she appeared to misconceive the facts of Lavira's case, asking Lavira's counsel, "How do you overcome the fact that he has been convicted of three drug trafficking crimes?" A.R. 187. Lavira was in fact convicted of two crimes and *Matter of Y-L-* confines the "particularly serious crime" inquiry to the facts underlying the crime upon which removal is predicated, here just one offense. Moreover, the number of drug trafficking crimes does not appear as a relevant consideration when the inquiry under *Matter of Y-L-* is whether the crime for which he is being deported is a minor drug offense and thus not a particularly serious crime.

At the last hearing the IJ rendered an oral decision, ultimately determining that withholding was unavailable. She

[5]     In a later portion of the opinion, the BIA declared that it found that "a drug 'courier' plays more than a sufficiently active part in a distribution conspiracy to render his conviction a 'particularly serious crime.'" *Matter of Y-L-*, 23 I. & N. at 278.

10

stated her reasoning: "[n]ot only because he has been convicted of an aggravated felony, but because he has been convicted of a drug trafficking offense. Which is presumptively and [sic] particularly serious crime. No evidence has been submitted to this Court that would allow the Court to find that departure from this interpretation would be warranted or permissible." Appx. 16-17. This language is the entirety of the IJ's decision on this point; the IJ did not allude to the facts of the crime, notwithstanding the BIA's directive that she was to do so on remand. Nor did the IJ refer to *Y-L-* or engage in any reasoning.

## B. Convention Against Torture Claim

Lavira's CAT challenge to the Haitian facility was by no means the first of its kind. In fact, our previous cases have made us all too aware of the deplorable conditions in the Haitian prisons. *See, e.g., Auguste*, 395 F.3d at 129. What makes Lavira's claim distinguishable from past attacks, however, is his physical condition and the record evidence in this case.

When Lavira's application for withholding and deferral was first brought before the IJ on remand, he had not yet tested positive for HIV. The torture claim was thus initially based on Lavira's fear that would be tortured while detained in the Haitian facility by prison guards who would target the wheelchair-bound Aristide supporter.

During the proceedings that occurred in the weeks leading up to the IJ's oral decision, and prior to learning that Lavira was HIV positive, the IJ evinced concern about sending Lavira to Haiti's notorious facility (Haiti's National Penitentiary) in light of his amputee status. She distinguished Lavira's case from that of the typical person who is sent to the facility and she distinguished Lavira's challenge from a generalized attack on the facility conditions. She also questioned the Government intently on this point: "How do you deal with the fact of somebody who has the physical condition–the physical disabilities and injuries that the respondent has? And the conditions of the Haitian prisons?" Tr. Oct. 26, 2004 Hr'g at 77. The IJ discussed the horrific conditions the BIA had considered in a previous case, *Matter of J-E-* and stated that those conditions "were present in the Matter of J-E-, but J-E-, if I recall correctly, was not confined to a wheel chair, appeared to have two legs and appeared to be ambulatory." *Id.*

Unsatisfied with the Government's answers, the IJ then held the case over for several weeks in order to take additional evidence as to what would happen to Lavira if he were sent to the facility. She instructed Lavira's attorney to gather "objective evidence on the treatment of some body [sic] in Mr. Lavira's physical condition and health conditions would be treated in the prisons in Haiti." *Id.* at 78. The Government attorney offered to do the same. The IJ then specifically stated two key facts she would expect to have before her at the next

12

hearing: "what kind of treatment does somebody, such as Mr. Lavira require to have because of his medical situation" and "is that kind of treatment available in a detention setting in Haiti . . . . [Y]ou might also want to focus a little bit [of] attention on what are the consequences to him should he not have that kind of treatment." *Id.* at 80.

While attorneys for the Government and for Lavira were assembling the additional information, Lavira tested positive for HIV. Based on this diagnosis, counsel for Lavira submitted to the IJ as part of the record a doctor's report describing Lavira's medical needs and an affidavit by Michelle Karshan, an expert on mistreatment in Haiti's prisons. The extensive expert report detailed the conditions of both Lavira and the prisons and opined that in light of Lavira's medical condition his health would dramatically deteriorate upon incarceration, and that he would lose 30 pounds in a matter of weeks (Lavira is of average height and weight). The report detailed the pain and suffering that would be inflicted on Lavira, both by the guards who would single out the HIV-positive prisoner and by the lethal combination of slave-ship conditions and the prisoner's infection with the virus that causes an incurable auto-immune disease.

At the final hearing on February 8, 2005, the IJ first noted that the Government's attorney had indicated that he would request that DHS exercise its discretion and defer removal in

13

light of Lavira's condition.[6] The IJ then rendered her decision. In her oral decision, the IJ made no mention of the Government's previously stated intention to recommend discretionary deferral, nor did the IJ mention the Karshan report or the doctor's report. Despite the IJ's earlier concern about Lavira's condition, the BIA's instruction that he be permitted to flesh out his CAT claim, and the record evidence of the unique pain and suffering that awaited Lavira in Haiti, the IJ's decision failed to mention Lavira's HIV status or address the specific problems he would face. The IJ denied the CAT claim in the following sentences:

> [T]he Third Circuit in Auguste v. Ridge, looked at the general prison conditions in Haiti and found that for an act to constitute torture, it must be intentionally inflicted with the specific intent to cause. There is no specific intent and the Third Circuit found the deplorable and a [sic] poor prison conditions that exist in Haiti are not the result of specific intent to cause torture, but rather a result of the general climate in Haiti, the lack of

---

[6]Questioned by our panel on this point at oral argument, counsel for Lavira stated that the Government had agreed to pursue discretionary deferral only if Lavira waived his right to appeal the IJ's decision. Electing not to rest her client's fate on the Government's promise to seek deferral, Lavira's counsel perfected the appeal.

funding. And it is a general state of affairs. All prisoners who are detained in Haiti, are subject to the same deplorable conditions. The respondent would not be singled out. To be sure the respondent does have certain disabilities, but *there is no evidence that has been submitted other than evidence relating to the general overall deplorable conditions that could lead this Court to conclude that the respondent would be placed or detained upon his return to Haiti with an intent to inflict severe pain or suffering*.

Appx. 19 (emphasis added).

The BIA affirmed the IJ's decision in a streamlined order by a single judge, and Lavira timely appealed.

## II.    DISCUSSION

### A.    Standard of Review

The BIA adopted the opinion of the IJ, and as such we review the IJ's decision. *See Chen Yun Gao v. Ashcroft*, 299 F.3d 266, 271 (3d Cir. 2002) ("When the BIA does not render its own opinion . . . and either defers or adopts the opinion of the IJ, a Court of Appeals must then review the decision of the IJ."). Under *Alaka v. Gonzales*, 456 F.3d 88 (3d Cir. 2006), we review *de novo* the question of whether Lavira's drug conviction is a

15

particularly serious crime. *Id.* at 104 ("We thus have jurisdiction over whether the IJ misapplied the law in determining whether Alaka's bank fraud conviction was 'particularly serious.'"). With respect to the CAT claim, we have jurisdiction to review an order denying a CAT claim under 8 U.S.C. § 1252(a)(2)(C) and 8 U.S.C. § 1252(a)(2)(D), and we review *de novo* constitutional claims and questions of law (including the application of law to fact), while "factual or discretionary determinations . . . fall outside the jurisdiction of the court of appeals entertaining a petition for review." *Sukwanputra v. Gonzales*, 434 F.3d 627, 634 (3d Cir. 2006).

In addition, a decisionmaker such as the IJ "must actually consider the evidence and argument that a party presents." *Abdulai v. Ashcroft*, 239 F.3d 542, 549 (3d Cir. 2001) (internal quotations omitted). An IJ decision that flatly ignores the grounds presented by the petitioner fails to furnish the Court of Appeals with the basis for its particular decision, and as such any meaningful review is not possible. Accordingly, remand is appropriate in such circumstances because under *INS v. Ventura*, 537 U.S. 12 (2002), "a reviewing court is powerless to decide in the first instance issues that an agency does not reach." *Konan v. Att'y Gen. of the United States*, 432 F.3d 497, 501 (3d Cir. 2005).

16

## B.     Particularly Serious Crime

We first address the question of whether the IJ committed legal error by finding that Lavira's drug conviction was a "particularly serious crime" disqualifying him from withholding of removal under 8 U.S.C. § 1231(b)(3) and the CAT.  As noted above, Lavira's case had been before an IJ once before and on appeal the BIA reversed the IJ and remanded the case, instructing the IJ to consider the circumstances surrounding Lavira's drug trafficking crime and to determine whether Lavira had in fact been convicted of a "particularly serious crime" as defined by the statute.  We can find no indication in the record that the circumstances of Lavira' s offense were indeed considered by the IJ on remand in her ruling regarding the nature of the crime.

Lavira testified that the conviction for attempting the sale of a controlled substance resulted from his accepting $10 from an undercover police officer in order to obtain crack cocaine for the officer.  Lavira never purchased the drugs; it is not clear from the record whether that is because he was arrested or whether he simply failed to make the purchase.  The facts of this offense appear to place him squarely within the exception carved out by the six-part test in *Matter of Y-L-*.   The Government argues that Lavira was like the "courier" in *Matter of Y-L-*, and therefore the crime should be deemed particularly serious.  However, Lavira's case bears no resemblance to the petitioner who was denied relief in *Matter of Y-L-*.  There was

17

no distribution conspiracy at all in Lavira's case, to say nothing of one approaching the scope and sophistication of the conspiracy in *Matter of Y-L-*. The courier deemed to have committed a particularly serious crime in *Matter of Y-L-* confessed to "participation in a conspiracy to produce cocaine in Puerto Rico and transport it in *multi-kilogram* quantities for subsequent distribution in New York. . . . [A]ny scheme designed to transport cocaine in such large quantities necessarily exposed numerous individuals to physical harm." *Matter of Y-L*, 23 I. & N. Dec. at 278 (emphasis in original). During the hearings, the IJ correctly recognized *Matter of Y-L-* as the relevant precedent, though she did not mention the six-part test that would have possibly excepted Lavira's crime from being considered "particularly serious." We question, therefore, whether the IJ ever actually applied *Matter of Y-L-* to the facts of Lavira's conviction for attempted sale or analyzed the six relevant factors.

As noted above, at the hearing during which the IJ issued her opinion and denied Lavira's "particularly serious crime" claim, the IJ focused on the fact that he had several drug trafficking convictions. A.R. 187. She asked Lavira's counsel, "How do you overcome the fact that he has been convicted of three drug trafficking crimes?", a question that is both factually incorrect and irrelevant to the issue of whether the crime for which Lavira is being deported is particularly serious under 8 U.S.C. § 1231(b)(3). The IJ stated correctly that Lavira's drug trafficking offense is presumptively a particularly serious crime,

18

but inexplicably declared that "[n]o evidence has been submitted to this Court that would allow the Court to find that departure from this interpretation would be warranted or permissible." Appx. 16-17. That statement is quite simply at odds with the undisputed facts of Lavira's case when viewed through the lens of the six-part test in *Matter of Y-L-*. Furthermore, the BIA had specifically remanded the case to the IJ for further consideration of Lavira's particular circumstances.

"While the IJ 'is not required to write an exegesis on every contention,' he must show 'that [he] has reviewed the record and grasped the movant's claims." *Korytnyuk v. Ashcroft*, 396 F.3d 272, 294 (3d Cir. 2005) (quoting *Sevoian v. Ashcroft*, 290 F.3d 166, 178 (3d Cir. 2002)). Here, the declaration that "[n]o evidence has been submitted to this Court that would allow the Court to find that" the crime was not particularly serious collides with the record evidence as to the nature of the crime and the unique facts in Lavira's favor. The IJ never referred to the facts of the crime, and made only a conclusory statement. The IJ has the duty of correctly apprehending the basis of a petitioner's claim–especially where, as here, the BIA so instructed. Here that appears not to have happened.

We are thus left with the firm impression that the IJ "missed the mark" in disposing of Lavira's challenge to the "particularly serious crime" designation. *Konan v. Att'y Gen. of the United States*, 432 F.3d 497, 501 (3d Cir. 2005). In *Konan*

19

we concluded that the BIA's findings "miss[ed] the mark" because they appeared to ignore the factual basis of the applicant's claim. Similarly, here either the IJ failed to consider the factual basis, or if the IJ did do so, we cannot discern her reasoning in doing so. Accordingly, the IJ's decision must be remanded once again so that we have a basis for reviewing the IJ's legal conclusion. *Vente v. Gonzales*, 415 F.3d 296, 302-03 (3d Cir. 2005) ("[I]f the BIA fails to address one of an applicant's stated grounds for relief, the case must be remanded for the BIA to consider the claim.").

## C.      Convention Against Torture

We next take up the question of whether the IJ committed legal error by denying Lavira's CAT claim regarding the conditions in Haiti's prisons, taking into account his unique physical condition. For CAT claims, the "burden of proof is on the applicant for withholding of removal . . . to establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal. The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration." 8 C.F.R. § 208.16(c)(2). Factors in determining whether or not torture is likely to occur include evidence of past torture inflicted upon the applicant; the ability to relocate within the country to a place where torture will not occur; evidence of gross, flagrant, or mass violations of human rights; and other relevant information regarding conditions in the country of removal. 8 C.F.R. § 1208.16(c)(3).

20

Article I of the CAT defines torture as:

> Any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, whether such pain or suffering is inflicted by or at the instigation of or within the consent or acquiescence of a public official or other person acting in an official capacity.

Art. 1(1), S. Treaty Doc. No. 100-20, 1465 U.N.T.S. 85.

The BIA has distilled the regulations implementing the CAT as follows:

> For an act to constitute torture it must be: (1) an act causing severe physical or mental pain or suffering; (2) intentionally inflicted; (3) for a proscribed purpose; (4) by or at the instigation of or with the consent or acquiescence of a public official who has custody or physical control of the victim; and (5) not arising from lawful sanctions.

21

*Matter of J-E-*, 23 I. & N. Dec. 291, 297 (BIA 2002).

We have clear precedent that guides our analysis of this issue as it pertains specifically to the prisons in Haiti. In our recent, comprehensive opinion in *Auguste v. Ridge*, 395 F.3d 123 (3d Cir. 2005), we embraced the five-part test referenced in *Matter of J-E-*, applying it in the context of a CAT challenge to Haiti's detention facility. There we held that the overall conditions of the facility did not constitute torture. Specifically, in *Auguste* we interpreted torture under the CAT[7] and its implementing regulations to include only the intentional infliction of severe pain or suffering upon a person, and found that where the petitioner relied only on the general conditions of the Haitian detention facility, he could not qualify for relief under the CAT.

In *Auguste* we concluded that the conditions in the facility, while "objectively deplorable," *Auguste*, 395 F.3d at 153, did not constitute torture. We described those conditions in the following terms:

> The prison population is held in cells that are so tiny and overcrowded that prisoners must sleep

---

[7]As in *Auguste*, "we continue to use . . . the colloquial reference to a 'CAT claim' rather than a 'FARRA claim.'" *Auguste*, 395 F.3d at 133 n.7.

22

sitting or standing up, and in which temperatures can reach as high as 105 degrees Fahrenheit during the day. Many of the cells lack basic furniture, such as chairs, mattresses, washbasins or toilets, and are full of vermin, including roaches, rats, mice and lizards. Prisoners are occasionally permitted out of their cells for a duration of about five minutes every two to three days. Because cells lack basic sanitation facilities, prisoners are provided with buckets or plastic bags in which to urinate and defecate; the bags are often not collected for days and spill onto the floor, leaving the floors covered with urine and feces. There are also indications that prison authorities provide little or no food or water, and malnutrition and starvation is a continuous problem. Nor is medical treatment provided to prisoners, who suffer from a host of diseases including tuberculosis, HIV/AIDS, and Beri-Beri, a life-threatening disease caused by malnutrition. At least one source provided by Auguste likened the conditions in Haiti's prisons to a "scene reminiscent of a slave ship."

*Auguste*, 395 F.3d at 129.

The record also contained reports of beatings of prisoners by guards. State Department reports on conditions in Haiti in

23

2001 and 2002 discussed police mistreatment of prisoners and noted that there were isolated allegations of torture by electric shock, as well as instances in which inmates were burned with cigarettes, choked, or were severely boxed on the ears, causing ear damage. The authorities' track record in disciplining police misconduct was inconsistent at best. *Auguste*, 395 F.3d at 129. Nevertheless, the deplorable condition of the facility alone did not constitute torture.

As we wrote:

> [I]n the context of the Convention, for an act to constitute torture, there must be a showing that the actor had the intent to commit the act as well as the intent to achieve the consequences of the act, namely the infliction of the severe pain and suffering. In contrast, if the actor intended the act but did not intend the consequences of the act, i.e., the infliction of the severe pain and suffering, although such pain and suffering may have been a foreseeable consequence, the specific intent standard would not be satisfied.

*Auguste*, 395 F.3d at 145-46.

We found that the severe pain that detainees experienced was not specifically intended–rather, it "result[s] from Haiti's economic and social ills, not from any intent to inflict severe

24

pain and suffering on detainees by, for instance, creating or maintaining the deplorable prison conditions." *Id.* at 153. In our holding, we engaged in an extended exegesis of the ratification of the CAT and the drafting of the implementing regulations, *see Auguste*, 395 F.3d at 138-48. We firmly established specific intent as the appropriate standard and distinguished as dictum the language in *Zubeda v. Ashcroft*, 333 F.3d 463 (3d Cir. 2002) that "requiring an alien to establish the specific intent of his/her persecutors could impose insurmountable obstacles to affording the very protections the community of nations sought to guarantee under the Convention Against Torture." *Id.* at 474. In *Auguste*, we explained that the "basis of our holding in *Zubeda* was limited to the defects in the BIA's reversal of the IJ's ruling that *Zubeda* was entitled to relief under the CAT. . . . Our discussion of the specific intent standard in 8 C.F.R. § 208.18(a)(5) was not necessary to our finding of the defects in the BIA's opinion." *Auguste*, 395 F.3d at 148.

In doing so, we gave our blessing to the interpretation the BIA had adopted in *Matter of J-E-*, 23 I. & N. Dec. 291 (BIA 2002), which involved Haiti and the CAT. In *Matter of J-E-*, the petitioner challenged his removal to Haiti and its detention facility, arguing that his indefinite detention in the facility's awful conditions as well as the predictable mistreatment by the guards constituted torture under the CAT. The Board in *Matter of J-E-* found that relief under the CAT required a specific intent to inflict severe pain or suffering, an interpretation that

25

"defin[ed] that term as it is ordinarily used in American criminal law," *Auguste*, 395 F.3d at 145, and in *Auguste* we approved of that reading. *Id.* at 145-46. The culpable mental states that would be sufficient to find in favor of the claimant were therefore necessarily limited. Applying this standard of intent to the facts of the case, *Auguste* held that the deplorable conditions in the Haitian facility did not constitute torture under the CAT.

It is important to understand how we reached that conclusion in *Auguste* in order to analyze properly the IJ's decision in Lavira's case. The original IJ in *Auguste* found the facts indistinguishable from those presented in the BIA decision in *Matter of J-E-*, 23 I. & N. Dec. 291 (BIA 2002), and focused much of its attention on that case. We followed the same approach in *Auguste*, making *Matter of J-E-* the focus of our discussion of the CAT issues, as "the administrative facts in this matter are the same as those in the factual record the BIA considered in Matter of J-E-." *Auguste*, 395 F.3d at 150.

There was nothing about Auguste's physical or mental condition which set him apart from the petitioner in *Matter of J-E-* or the general population incarcerated at the facility, a fact which was noted by Auguste's IJ, the district court which heard his habeas claim, as well as our Court. *See Auguste*, 395 F.3d at 136 ("[T]he IJ found Auguste's CAT claim to be virtually indistinguishable from the matter presented in Matter of J-E- . . . . ."); *id.* at 137 ("'[W]e have circumstances here where we

26

have simply the allegation of general prison conditions in Haiti.'" (quoting unpublished District Court decision)); *id.* ("'[T]here must be some sort of underlying intentional direction of pain and suffering against a particular petitioner, more so than simply complaining of the general state of affairs that constitute conditions of confinement in a place, even as unpleasant as Haiti.'" (quoting unpublished District Court decision); *see also id.* at 154 ("In effect, Auguste is complaining about the general state of affairs that exists in Haitian prisons. The brutal conditions are faced by all prisoners and are *not suffered in a unique way* by any particular detainee or inmate.") (emphasis added); *id.* ("Auguste has not . . . offered any evidence tending to show that he faces an increased likelihood of torture *anymore than the alien in Matter of J-E-*.") (emphasis added).

Thus, Auguste's claim failed because he was understood to be presenting a generalized claim against the Haitian facility no different from that presented in *Matter of J-E-*. The poor prison conditions did not constitute torture because they were not specifically directed by officials towards him or intended by officials to cause severe pain or suffering. Auguste did not possess any characteristics or qualities unique to his situation which would permit a different analysis or result. *Auguste*, 395 F.3d at 145-46. The fact that severe pain and suffering was a possibility in the facility was not enough to merit a finding that it was more likely than not that there would be an intent on the part of the guards or the officials who placed Auguste in the

27

facility to inflict severe pain upon him. The "mere fact that the Haitian authorities have knowledge that severe pain and suffering may result by placing detainees in these conditions does not support a finding that the Haitian authorities intend to inflict severe pain and suffering." *Id.* at 153-54.

In *Auguste* we included a caveat: "we caution that we are not adopting a per se rule that brutal and deplorable prison conditions can never constitute torture. To the contrary, if there is evidence that authorities are placing an individual in such conditions with the intent to inflict severe pain and suffering on that individual, such an act may rise to the level of torture should the other requirements of the Convention be met." *Id.* at 154.[8] Following *Auguste*, where we have found the claims presented to be no different from Auguste's, we have rejected petitioners' CAT claims. *See, e.g.*, *Francois v. Gonzales*, 448 F.3d 645, 652 (3d Cir. 2006) ("Francois' claim is factually indistinguishable from the one we rejected in *Auguste*. Accordingly, we hold that Francois is not eligible for relief under the CAT.").

---

[8]Nor did *Auguste* hold that under the CAT detainees had to demonstrate an intent to torture. A showing of an intent to inflict severe pain and suffering was what the Convention required. *See Auguste*, 395 F.3d at 146 ("Section 208.18(a)(5) only requires that the act be specifically intended to inflict severe pain and suffering, not that the actor intended to commit torture. The two are distinct and separate inquiries.").

28

Lavira argued before the IJ, the BIA, and this Court that his case is distinguishable from *Auguste*, and fits the situation described in the caveat quoted above, in two principal ways. First, he argues that it is likely that he will be singled out by the prison guards due to his HIV status, his status as an above-the-knee amputee, and his pro-Aristide political affiliation. Second, he argues that he is uniquely vulnerable to the horrid conditions at Haiti's detention facility due to being HIV positive, and that to place him knowingly in the disease-infested Haitian facility is to intentionally subject him to severe pain and suffering, even death. Lavira urges that his obvious vulnerability and its nearly inevitable consequences, supported by the opinions of a doctor and an expert on Haiti's facility, satisfy the requirement that the harm that awaits him is specifically intended.

The IJ addressed the issue of Lavira's CAT claim in the most general of terms, almost cryptically ignoring the specific facts at hand in the record: "[I]t is a general state of affairs. All prisoners who are detained in Haiti, are subject to the same deplorable conditions. The respondent would not be singled out. To be sure the respondent does have certain disabilities, but there is no evidence that has been submitted other than evidence relating to the general overall deplorable conditions that could lead this Court to conclude that the respondent would be placed or detained upon his return to Haiti with an intent to inflict severe pain or suffering." Appx. 19.

It cannot be questioned that the undisputed facts Lavira presented in support of his claim are not merely an attack on the "general state of affairs." Lavira's CAT claim details how guards will treat *this* HIV-positive prisoner, and addresses the specific act of placing someone with his medical conditions in a disease-infested facility. The facts supporting Lavira's claim are "evidence tending to show that he faces an increased likelihood of torture" compared to the alien in *Matter of J-E-*, evidence which we said in *Auguste* could be the foundation of a CAT claim. *Auguste*, 395 F.3d at 123.

Contrary to the description provided by the IJ, the facts of Lavira's condition stand out distinctly as facts "other than evidence relating to the general overall deplorable conditions." Aside from the fact that Lavira is an above-the-knee amputee and thus more likely to have difficulty in defending himself against guards or other prisoners within the facility (even if provided a wheelchair), the dire consequences that await Lavira are undeniable. There is no dispute he has the virus that causes an incurable auto-immune disease. There is no dispute that medical care is wholly inadequate if not completely absent in the facility. There is no dispute that the conditions are rife with disease and comparable to a "slave ship." Severe pain is not "a" possible consequence that "may result" from placing Lavira in the facility, it is the only plausible consequence given what Haitian officials know about Lavira and about their own

30

facility.[9] Indeed, Lavira has specifically alleged the type of claim *Auguste* explicitly permits, a claim that "that authorities are placing an individual in such conditions with the intent to inflict severe pain and suffering on that individual." *Id.* at 154. Notably, at least one IJ has upheld a CAT claim on grounds similar to Lavira's.[10] In that case, the IJ correctly distinguished *Matter of J-E-* and finding that "the [HIV-positive] respondent's likely inability to obtain medication, in combination with the prison conditions in Haiti, may result in a more likely than not possibility that she will be tortured."[11]

---

[9]*Cf. Rhodes v. Chapman*, 452 U.S. 337, 347 (1981) ("[T]he denial of medical care [to prisoners] is cruel and unusual because, in the worst case, it can result in physical torture . . . ."); *Cronin v. Islamic Republic of Iran*, 238 F. Supp. 2d 222 (D.D.C. 2002) (finding torture under the Foreign Sovereign Immunities Act where plaintiff was abducted from a Beirut hospital while awaiting treatment for small bowel obstruction, beaten and held without treatment for three days in a cell, brought by his captors before a local doctor–who did not provide treatment–after his condition worsened dramatically, and then returned to his cell where he was again beaten and deprived of medical care).

[10]*See Matter of J-F-*, (BIA 2005) (unpublished) (Appx. 55-57) (issued post-*Auguste*). An affidavit by Michelle Karshan was part of the record before the IJ in *Matter of J-F-*.

[11]*Id.*

31

The Karshan expert report clearly stated that Lavira would have little or no chance of obtaining food and water, given his physical condition and the aggressive behavior required of detainees in order to obtain nourishment. The report also detailed how Lavira as an HIV-infected detainee would not receive any meaningful medical treatment because the Haitian system does not have antiretroviral drugs for HIV patients. These and other factors led the expert to conclude that Lavira would face the exceptionally dire prospect of losing 30 pounds soon after being incarcerated, and that death would follow shortly after.

We cannot help but conclude that *Auguste* demands no more than has been shown here. This is so because of the factual record, but also because of two unique aspects of the law regarding proof of intent. The first is that demonstrating proof of intent is necessarily an inferential endeavor in nearly every case; we must draw conclusions about actors' mental states from the conduct of those actors. In the CAT setting, those inferences are based on reports of the current activity in the proposed country of removal and predictions about what result will befall an individual after removal. Such an inquiry is different from the normal method of discerning or imputing intent–usually done in hindsight, after conduct has occurred. But in this setting, the IJ must make predictions about future states of mind. The CAT's implementing regulations recognize these concerns, urging IJs and courts to rely on the type of information normally used to determine intent. *See* 8 C.F.R. § 1208.16(c)(3) (listing

32

evidence of past torture inflicted upon the applicant and evidence of gross, flagrant, or mass violations of human rights as factors for determining whether or not torture is likely to occur). And IJs are obligated to consider "all evidence relevant to the possibility of future torture." 8 C.F.R. § 1208.16(c)(3). As such, IJs must be careful not to apply a standard of proof higher than *Auguste* requires,[12] or the facts permit, given the predictive and thus necessarily speculative inquiry into intent.

Second, we cannot rule out the generally accepted principle that intent can be proven through evidence of willful blindness. At least one CAT case interpreting *Auguste* has posited that certain mental states, such as willful blindness, may permit a finding of specific intent. *See Thelemaque v. Ashcroft*, 363 F. Supp. 2d 198, 215 (D. Conn. 2005) ("The Court recognizes that a mechanical application of the specific intent requirement might yield results at odds with the language and intent of CAT and that concepts such as deliberate indifference, reckless disregard or willful blindness might well suffice in certain circumstances to satisfy the specific intent requirement of the Convention."). While in *Auguste* we noted that mere recklessness was insufficient for a finding of specific intent under the CAT, Lavira is not relying on simple recklessness with respect to his condition. *See Auguste*, 395 F.3d at 145 (approving of *Matter of J-E-*'s determination that recklessness is a state of general intent). Our criminal law jurisprudence,

[12]*See* n.8 *supra*.

which we relied on in *Auguste*, *see Auguste*, 395 F.3d at 145, bolsters the view that a finding of specific intent could be based on deliberate ignorance or willful blindness. *See, e.g*, *United States v. Caminos*, 770 F.2d 361, 365 (3d Cir. 1985) ("[A] judge's version of the 'deliberate ignorance' instruction must make clear that the defendant himself was subjectively aware of the high probability of the fact in question, and not merely that a reasonable man would have been aware of the probability.").

Neither the IJ nor the BIA focused on the specifics of Lavira's situation in denying his CAT claim. When the IJ's findings are "wholly unsupported by the record and essentially ignore the actual basis of [the] claim," the case must be remanded so the IJ may take a "fresh look . . . one that focuses on the true underpinnings of that claim." *Vente v. Gonzales*, 415 F.3d 296, 302-03 (3d Cir. 2005). This happened here: Lavira presented an individualized attack on his removal to Haiti, an attack that was obviously specific to his case in light of the doctor's report on his medical condition and the expert report describing how removal would cause Lavira to lose 30 pounds in a short time. The IJ deemed Lavira's petition a general attack on the Haiti facility, and stated that there was no evidence that he would be "singled out." This was not only contradicted by the record, but by the IJ's own statements during Lavira's hearings. The IJ evinced great concern that Lavira would experience intense suffering based on his physical condition if sent to the Haitian facility, and this concern was demonstrated even before it was known that Lavira was HIV positive. The IJ

34

on her own distinguished Lavira from the petitioner in *Matter of J-E-*. After receiving an indication from the Government that it would seek discretionary deferral, the IJ appears to have done an about-face and reframed Lavira's challenge as a generalized attack, ignoring significant evidence to the contrary without any explanation whatsoever.

Thus, as we have ruled with respect to the particularly serious crime determination, we will similarly remand the IJ's CAT determination for further proceedings, as we lack the proper basis to review Lavira's legal challenge to the IJs determination. Necessary to our holding is the fact that the claim pressed by Lavira is non-frivolous and legally available.

V. **CONCLUSION**

For the reasons stated above, we will GRANT Lavira's Petition for Review and REMAND this case so the IJ may squarely address Lavira's challenge to the particularly serious crime designation and his challenge based on the CAT.[13] (The

---

[13]Lavira also argues that new evidence of worsening conditions in Haiti's prisons has come to light since the time *Auguste* was decided. Lavira notes that *Auguste* was decided in January of 2005 (argued in November 2004), and states that new evidence arising after the regime change in Haiti in February 2004 was not considered by the administrative record before that panel. As our decision decides Lavira's petition on other grounds, we do not take up this claim.

35

panel will retain jurisdiction in the event review subsequent to the Lavira's administrative proceedings is required.)

_____