# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-3736

_____

Shoodley Lee Cherichel,

        Petitioner,

    v.

Eric H. Holder, Jr., Attorney General
of the United States,

        Respondent.

\*
\*
\*
\*
\* Petition for Review from the
\* Board of Immigration Appeals.
\*
\*
\*
\*
\*

_____

Submitted: October 21, 2009
Filed: January 12, 2010

_____

Before MELLOY, SMITH, and SHEPHERD, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

Shoodley Cherichel, a native and citizen of Haiti, petitions for review of a decision of the Board of Immigration Appeals (BIA) denying his application for deferral of removal under the Convention Against Torture (CAT) and ordering him removed to Haiti. Cherichel argues that the BIA erred in applying a more onerous definition of specific intent under the CAT than was used by the Immigration Judge (IJ). For the following reasons, we deny the petition.

I.

A. Factual Background

Shoodley Cherichel was born in Haiti on November 23, 1979. Although he does not remember coming to the United States, it appears that he entered the United States without inspection sometime between 1982 and 1984. Since that time, Cherichel has never returned to Haiti. He does not speak Creole, Haiti's official language, and understands very little Creole when it is spoken to him. His mother, Meprisena Themistol, is a naturalized U.S. citizen, and he believes his siblings are also U.S. citizens. To his knowledge, Cherichel has no family members currently living in Haiti.

On April 18, 2000, Cherichel pled guilty to possession of marijuana in a Kentucky state court. On January 13, 2005, he was convicted in a Minnesota state court of criminal vehicular homicide and criminal vehicular operation resulting in substantial bodily harm, for which he received and served a 48-month sentence. The Immigration and Naturalization Service (INS)[1] served Cherichel with a Notice to Appear (NTA) on September 3, 2002. The NTA charged that Cherichel was subject to removal for being an alien present in the United States without being admitted or paroled, in violation of section 212(a)(6)(A)(i) of the Immigration and Nationality Act (INA), 8 U.S.C. § 1182(a)(6)(A)(i). Removal proceedings commenced on November 1, 2002. In 2005, DHS also charged Cherichel with removability under INA § 212(a)(2)(A)(i)(II), 8 U.S.C. § 1182(a)(2)(A)(i)(II), as being an alien who has been

---

[1]The INS was abolished and its functions assumed by the Department of Homeland Security (DHS) on March 1, 2003.

convicted of violating a law relating to a controlled substance, based on his Kentucky conviction.[2]

## B. Immigration Judge's Decision

Between January 23, 2003, and March 19, 2007, Cherichel had various removal hearings before Immigration Judge Kristin Olmanson.[3]  Cherichel asserted three arguments before the IJ: (1) that he should be granted asylum under INA § 208, 8 U.S.C. §1158; (2) that he was eligible for withholding of removal under INA § 241(b)(3), 8 U.S.C. §1231; and (3) that his removal should be deferred under Article 3 of the CAT.  At his final hearing on March 19, 2007, Cherichel testified that he was afraid to return to Haiti because he has no family there, and that he feared persecution in Haiti based on his "American" physical characteristics and English-speaking ability.  Additionally, Cherichel submitted extensive evidence concerning country and prison conditions in Haiti.

In an opinion dated May 3, 2007, the IJ found Cherichel removable on two of the three grounds charged.  Specifically, the IJ found that Cherichel was not eligible for asylum under INA § 208 because he failed to file for asylum within one year of his arrival or within a reasonable period of time after reaching the age of 18, see INA § 208(a)(2)(B), 8 U.S.C. § 1158(a)(2)(B), and that he was not eligible for withholding

----

[2]DHS also charged that Cherichel was removable under INA § 212(a)(2)(A)(i)(I), 8 U.S.C. § 1182(a)(2)(A)(i)(I), as being an alien who has been convicted of a crime involving moral turpitude, based on his Minnesota conviction.  Both the IJ and the BIA declined to rule on removability on this ground as the other two grounds were sufficient bases for removal.

[3]Cherichel's immigration hearings were continued a number of times during the pendency of his appeal on his Minnesota convictions.  Those convictions were upheld by the Minnesota Court of Appeals.  See State v. Cherichel, No. A05-738, 2006 WL 2529561 (Minn. Ct. App. Sept. 5, 2006) (unpublished).

of removal because his Minnesota convictions constituted particularly serious crimes under the INA, see INA § 241(b)(3)(B)(ii), 8 U.S.C. § 1231(b)(3)(B)(ii). However, the IJ granted Cherichel's application for deferral of removal under the CAT, finding that he had met his burden of proving that, as a criminal deportee, it is more likely than not that he would be tortured if removed to Haiti.[4]

First, the IJ noted that Cherichel provided extensive evidence—42 reports and articles—documenting country conditions in Haiti and the deplorable conditions in Haitian prisons and police stations where uncharged detainees are often held. This included a lack of basic hygiene, lack of food and water, a large number of malnourished prisoners, and severe overcrowding in cells with no toilet or sink. Second, the IJ noted that in the previous five years, prison conditions in Haiti had not improved, but in fact had worsened. Third, criminal deportees who had not broken any Haitian laws were held by authorities despite a 2006 Haitian court ruling prohibiting such detention. Fourth, unless a family member was able to claim responsibility for them, criminal deportees could be detained indefinitely. Fifth, the IJ noted that Cherichel had been in the United States for 25 years and could be identified in Haiti as an "American" because of his physical appearance, mannerisms, and inability to speak Creole. Based on this evidence, the IJ found that it was more likely than not that Cherichel would be tortured if removed to Haiti, and therefore granted Cherichel's application for deferral of removal.

## C. BIA Decisions

The BIA granted DHS's appeal from the IJ's decision, vacated the grant of deferral under the CAT, and ordered Cherichel removed to Haiti. In re Shoodley Lee Cherichel, File No. A95 204 110 (BIA Sept. 14, 2007). The BIA held that the IJ erred

---

[4]In doing so, the IJ distinguished the BIA's decision in In re J-E-, 23 I. & N. Dec. 291 (BIA 2002), overruled on other grounds by Azanor v. Ashcroft, 364 F.3d 1013 (9th Cir. 2004). See infra Part II.B.

in finding that Cherichel had met his burden of establishing CAT relief. Specifically, although it found no clear error in the IJ's findings regarding abysmal prison conditions in Haiti, the BIA held that those conditions do not "rise[] to the level of torture [because] the record does not reflect that Haitian authorities *specifically intend* to inflict severe physical or mental pain or suffering to criminal deportees such as [Cherichel]." Id. at 3 (quotation omitted). The BIA also held that "the circumstances presented here are not significantly distinct from those we considered in [In re J-E-, 23 I. & N. Dec. 291 (BIA 2002), overruled on other grounds by Azanor v. Ashcroft, 364 F.3d 1013 (9th Cir. 2004)]." Id. at 4.

Cherichel appealed the BIA's decision to this court. In lieu of issuing a formal opinion, we granted the government's motion to remand the case back to the BIA "for reconsideration in light of its scope of review."[5] Cherichel v. Mukasey, No. 07-3313, slip op. at 1 (8th Cir. Mar. 26, 2008). On remand, the BIA again ordered Cherichel removed to Haiti. In re Shoodley Lee Cherichel, File No. A95 204 110 (BIA Oct. 29, 2008). After holding that no additional fact-finding was required, the BIA reviewed de novo the IJ's findings regarding eligibility for relief under the CAT. Id. at 1-2. The BIA held that none of the facts found by the IJ, including those that differentiated Cherichel from the petitioner in In re J-E-, "show[ed] that Haitian authorities, in their treatment of criminal deportees, specifically intend to inflict torture." Id. at 2. Therefore, the BIA held that Cherichel had failed to meet his burden of proof under the CAT and ordered him removed to Haiti.

---

[5]On remand, the BIA "specifically address[ed] the issue of whether Haitian authorities did not specifically intend to inflict severe physical or mental pain or suffering to criminal deportees . . . in light of the factfindings made by the immigration judge." In re Shoodley Lee Cherichel, File No. A95 204 110, at 1 (BIA Oct. 29, 2008) (quotation omitted).

Cherichel appeals, arguing that the BIA applied an incorrect definition of specific intent to the CAT's intent requirement. In deciding the correct legal definition to apply, we first review the history and codification of the CAT, as well as how the CAT and its implementing regulations have been subsequently interpreted.

## A. History of the CAT

The ratification history of the CAT and its subsequent enactment into domestic law have been thoroughly examined. See Auguste v. Ridge, 395 F.3d 123,129-34 (3d Cir. 2005); In re J-E-, 23 I. & N. Dec. at 294-99; see generally J. Herman Burgers & Hans Danelius, The United Nations Convention Against Torture: A Handbook on the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (1988). While we see no need to repeat that examination here, some discussion of the history of the CAT is necessary to our analysis.

The CAT was adopted by the United Nations General Assembly on December 10, 1984.[6] See Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, S. Treaty Doc. No. 100-20 (1988), 1465 U.N.T.S. 85. It has as its stated purpose "to make more effective the struggle against torture and other cruel, inhuman or degrading treatment or punishment throughout the world." Id. pmbl. To accomplish this goal, Article 2 of the CAT requires "[e]ach State Party [to] take effective legislative, administrative, judicial or other measures to prevent such acts of torture in any territory under its jurisdiction." Id. Art. 2(1). Additionally, Article 3 provides that "[n]o State Party shall expel, return (*'refouler'*)

---

[6]The CAT built on previous international agreements seeking to expand human rights and curtail the use of torture around the world, including the Universal Declaration of Human Rights of 1948 and the Geneva Conventions of 1949. See Burgers & Danelius, supra, at 5-30.

or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." Id. Art. 3(1). The CAT defines torture as:

> any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, whether such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity. It does not include pain or suffering arising only from, inherent in or incident to lawful sanctions.

Id. Art. 1(1).

President Reagan signed the CAT on April 18, 1988, and sent it to the Senate for advice and consent on May 20, 1988. Id. at iii. Importantly, President Reagan (and later President George H.W. Bush) proposed, and the Senate eventually adopted, a number of reservations, understandings, and declarations pertaining to the CAT, two of which are relevant to this case. First, with respect to the definition of torture under Article 1, President Bush proposed the understanding that "in order to constitute torture, an act must be specifically intended to inflict severe physical or mental pain or suffering." S. Exec. Rep. 101-30, at 9, 36 (1990). Second, President Bush proposed that "[t]he United States understands the phrase 'where there are substantial grounds for believing that he would be in danger of being subjected to torture' as used in Article 3 of the Convention, to mean 'if it is more likely than not that he would be tortured.'" Id. at 16.

Although the CAT had been signed by the President and ratified by the Senate, it was not self-executing, "which means there is no direct right of action for violation

-7-

of the treaty, only for violation of any domestic law implementing the treaty." Raffington v. Cangemi, 399 F.3d 900, 903 (8th Cir. 2005); see also Auguste, 395 F.3d at 132 n.7 (citing cases). Congress implemented the CAT with the passage of the Foreign Affairs Reform and Restructuring Act of 1998 (FARRA), Pub. L. No. 105-277, Div. G, Title XXII, § 2242, 112 Stat. 2681, 2681-822 (codified as note to 8 U.S.C. § 1231).[7]

The first section of FARRA states that "[i]t shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture." Id. To achieve this goal, FARRA directs "the heads of the appropriate agencies [to] prescribe regulations to implement the obligations of the United States under Article 3 of the [CAT], subject to any reservations, understandings, declarations, and provisos contained in the United States Senate resolution of ratification of the Convention." Id.

Pursuant to FARRA, the Department of Justice (DOJ) promulgated regulations setting forth the procedures under which a person could seek relief under the CAT. See Regulations Concerning the Convention Against Torture, 64 Fed. Reg. 8478 (Feb. 19, 1999) (codified at 8 C.F.R. §§ 208.16(c)-.18(a) (2004)). Section 208.18(a) defines the terms to be used in applying the United States' obligations under the CAT, which "incorporate the definition of torture contained in Article 1 of the [CAT], subject to the reservations, understandings, declarations, and provisos contained in the United

---

[7]As the Third Circuit has repeatedly noted, because there is no direct right of action for violation of the CAT, only for violation of FARRA, Cherichel's claim is technically a FARRA claim. See Pierre v. Att'y Gen., 528 F.3d 180, 186 n.5 (3d Cir. 2008) (en banc); Auguste v. Ridge, 395 F.3d 123,133 n.7 (3d Cir. 2005); Ogbudimkpa v. Ashcroft, 342 F.3d 207, 221 n.24 (3d Cir. 2003). However, because the pertinent provisions of FARRA and the CAT are substantively identical, this distinction is inconsequential, and we will continue to refer to Cherichel's claim as a CAT claim.

States Senate resolution of ratification of the Convention." 8 C.F.R. § 208.18(a). Instead of enumerating acts that could constitute torture, § 208.18(a) combines the Senate's understandings with Article 1 of the CAT to formulate a basic, general definition of torture:

> (1) Torture is defined as any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

> (2) Torture is an extreme form of cruel and inhuman treatment and does not include lesser forms of cruel, inhuman or degrading treatment or punishment that do not amount to torture.

> (3) Torture does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions. . . .

> (5) In order to constitute torture, an act must be *specifically intended* to inflict severe physical or mental pain or suffering. An act that results in unanticipated or unintended severity of pain and suffering is not torture. . . .

> (7) Acquiescence of a public official requires that the public official, prior to the activity constituting torture, have awareness of such activity and thereafter breach his or her legal responsibility to intervene to prevent such activity.

Id. (emphasis added). The regulations also import the "more likely than not" standard for proving torture that was contained in both the President's and Senate's understandings of the CAT. See 8 C.F.R. § 208.16(c)(2). Once a petitioner has met

this standard, withholding of removal or deferral of removal is mandatory.[8]  8 C.F.R. §§ 208.16(c)(4), 208.17(a).

Thus, all three important documents—the United States' understandings of the CAT, the law giving the CAT domestic effect, and the regulations implementing that effect in the immigration context—incorporate the understandings of the President and the Senate that, in order to constitute torture, an act must be specifically intended to inflict severe pain or suffering.

## B.  In re J-E-

In 2002, the BIA considered the issue of whether "indefinite detention, inhuman prison conditions, and police mistreatment . . . constitute torturous acts" under the CAT.  In re J-E-, 23 I. & N. Dec. at 292.  There, a native and citizen of Haiti who had resided in the United States for approximately ten years and had been convicted of the sale of cocaine in Florida, was ordered removed to Haiti.  Id. at 292-93.  At his removal hearing, the petitioner introduced evidence showing that if he were removed to Haiti, he would be detained under deplorable conditions.[9]  Id. at 293.  Those conditions included "prison facilities [that] are overcrowded and inadequate[,]" where prisoners, many of whom are malnourished, "are deprived of adequate food, water, medical care, sanitation, and exercise."  Id.  At the conclusion of the hearing, the IJ nevertheless found the petitioner ineligible for CAT relief.  Id.

---

[8]Although eligibility for withholding of removal and deferral of removal under the CAT are addressed in different sections of the regulations, the "more likely than not" standard is used for each.  See 8 C.F.R. §§ 208.16(c)(4) (withholding of removal), 208.17(a) (deferral of removal).

[9]This evidence included the Department of State's 2001 Background Note on Haiti, five newspaper articles addressing Haitian prison conditions, "a set of photographs of malnourished, dying Haitian inmates," and a letter from a Department of State official.  In re J-E-, 23 I. & N. Dec. at 293.

On appeal, the BIA began its analysis with an examination of the ratification history of the CAT and its implementing regulations. Id. at 294-99. After noting that the regulatory definition of torture in 8 C.F.R. § 201.18(a) governed its decision, the BIA summarized that definition to develop a test for CAT claims: "For an act to constitute torture it must be: (1) an act causing severe physical or mental pain or suffering; (2) intentionally inflicted; (3) for a proscribed purpose; (4) by or at the instigation of or with the consent or acquiescence of a public official . . . ; and (5) not arising from lawful sanctions." Id. at 297. In discussing the level of intent required, the BIA noted that "an act that results in unanticipated or unintended severity of pain or suffering does not constitute torture." Id. at 298.

The BIA then turned to the question of whether any of the specific state actions alleged by the petitioner—indefinite detention, inhuman prison conditions, and police mistreatment—constituted torture within the meaning of the regulations. Id. at 299. Examining first the petitioner's claim that he would be indefinitely detained by Haitian authorities, the BIA found it "undisputed that the respondent will be subject to detention of an indeterminate length on his return to Haiti." Id. This detention of criminal deportees is designed by the Haitian government as a deterrent, "to prevent the 'bandits' from increasing the level of insecurity and crime in the country." Id. at 300 (quotation omitted). As such, the BIA found that the detention of criminal deportees did not constitute torture, because it is "a lawful enforcement sanction designed . . . to protect the populace from criminal acts committed by Haitians who are forced to return to the country after having been convicted of crimes abroad." Id.

Turning next to the petitioner's claim that indefinite detention, coupled with inhuman prison conditions, amounted to torture, the BIA noted that an "act must be *specifically intended* to inflict severe pain or suffering" in order to constitute torture. Id. The BIA found this to be a "specific intent" requirement, not a "general intent"

-11-

requirement.  Id. at 300-01.  Citing the legal definition of specific intent,[10] the BIA found that Haitian authorities did not have the specific intent to inflict severe pain or suffering when they imprisoned criminal deportees in harsh conditions because "there is no evidence that they are intentionally and deliberately creating and maintaining such prison conditions in order to inflict torture."  Id. at 301.  Instead, the harsh conditions "are the result of budgetary and management problems as well as the country's severe economic difficulties."  Id.  As such, the detention of criminal deportees did not amount to torture, despite the fact that "Haitian authorities are intentionally detaining criminal deportees knowing that the detention facilities are substandard."  Id.

Finally, in addressing the petitioner's claim that physical mistreatment by Haitian authorities would amount to torture,[11] the BIA held that the evidence showed only "isolated instances of mistreatment in Haitian prisons that rise to the level of torture."  Id. at 302.  This was insufficient to meet the petitioner's burden of proof of showing that it was more likely than not that he would be tortured.  Id. at 303.  Based on the foregoing findings, the BIA dismissed the appeal.  Id. at 304.

---

[10]"'Specific intent' is defined as the 'intent to accomplish the precise criminal act that one is later charged with' while 'general intent' commonly 'takes the form of recklessness . . . or negligence.'"  Id. at 301 (alteration in original) (quoting Black's Law Dictionary 813-14 (7th ed. 1999)).

[11]There was little doubt that the petitioner would be physically mistreated in some way if returned to Haiti.  See id. at 301-02.  The only question was whether that mistreatment would rise to the level of torture.  See id. at 302 ("Instances of police brutality do not necessarily rise to the level of torture, whereas deliberate vicious acts such as burning with cigarettes, choking, hooding, kalot marassa [severe boxing of the ears], and electric shock may constitute acts of torture.").

III.

Cherichel argues that the BIA erred as a matter of law by applying the incorrect definition of specific intent to the CAT's intent requirement. According to Cherichel, the CAT's intent requirement is satisfied if severe physical or mental pain or suffering is merely the foreseeable consequence of a deliberate act. Cherichel argues that this "foreseeability" standard was adopted by the IJ and is consistent with Eighth Circuit caselaw. He also argues that the more onerous "specific intent" standard applied by the BIA causes the United States to hold the Haitian government to a lower standard than the United States holds its own interrogators. Finally, Cherichel contends that even under the more onerous specific intent standard adopted by the BIA, he is entitled to CAT relief because it is more likely than not that he will be tortured if returned to Haiti. We address these arguments seriatim.

## A. Standard of Review

Because Cherichel was ordered removed based in part on his Kentucky conviction for possession of marijuana, his removal implicates 8 U.S.C. § 1252(a)(2)(C), which purports to eliminate from appellate jurisdiction "any final order of removal against an alien who is removable by reason of having committed a criminal offense" involving controlled substances or crimes of moral turpitude. Section 1252(a)(2)(D), however, restores appellate jurisdiction to review such removal orders but limits review to "constitutional claims or questions of law." 8 U.S.C. § 1252(a)(2)(D). Because defining the correct legal standard of specific intent to apply to the CAT's intent requirement is a question of law, we retain jurisdiction over Cherichel's appeal pursuant to 8 U.S.C. §1252(a)(2)(D) .

"'We review questions of law de novo and accord substantial deference to the BIA's interpretation of immigration law and agency regulations.'" Kim v. Holder, 560 F.3d 833, 836 (8th Cir.), cert. denied 130 S. Ct. 393 (2009) (quoting Arellano-

-13-

Garcia v. Gonzales, 429 F.3d 1183, 1185 (8th Cir. 2005)). Thus, because the regulations implementing the CAT are immigration regulations within the purview of the BIA, the BIA's interpretation of those regulations should generally be accorded substantial deference. See Malonga v. Mukasey, 546 F.3d 546, 553 (8th Cir. 2008); see also Pierre v. Gonzales, 502 F.3d 109, 116 (2d Cir. 2007) ("As to the CAT regulations: where the BIA interprets a regulation promulgated by the Attorney General under the INA, we afford substantial deference to the BIA's interpretation, unless it is plainly erroneous or inconsistent with the regulation, or inconsistent with the agency's previous interpretation." (quotations omitted)). This deference "may be qualified to the extent that [the BIA's] reading of the regulation . . . is a reading of terms that have application outside the context of immigration." Pierre, 502 F.3d at 114.[12] Factual determinations made by the IJ are outside the scope of our review "unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B).

## B.  Precedent

The specific issue before the court concerns the degree of intent Cherichel's future captors must have in order for Cherichel to be able to obtain CAT relief. In In re J-E-, the BIA held that, in the context of criminal deportees being return to Haiti, petitioners must prove that Haitian authorities specifically intend to torture; that is, that they "intentionally and deliberately creat[e] and maintain[] [abysmal] prison conditions in order to inflict" severe physical or mental pain or suffering. 23 I. & N.

---

[12]Cherichel argues that, because the CAT's definition of torture is interpreted and administered by multiple federal agencies, the BIA's definition of specific intent under the CAT is not entitled to any deference at all. We see no need to be drawn into a debate about how specific intent is defined by other agencies or in other contexts, or to articulate the precise level of deference to be shown the BIA in this case. As will be discussed below, we believe that the standard clearly expressed in the ratification history of the CAT compels the resolution of this case.

Dec. at 300-01. This decision has commanded deference from several circuits. See, e.g., Elien v. Ashcroft, 364 F.3d 392, 398-99 (1st Cir. 2004); Pierre, 502 F.3d at 119 (Second Circuit); Pierre v. Att'y Gen., 528 F.3d 180, 189 (3d Cir. 2008) (en banc); Auguste, 395 F.3d at 153 (Third Circuit); Villegas v. Mukasey, 523 F.3d 984, 988 (9th Cir. 2008); Cadet v. Bulger, 377 F.3d 1173, 1190, 1193, 1195 (11th Cir. 2004). Indeed, "[n]o federal circuit court considering the case of a Haitian criminal deportee has declined to follow *In re J-E*-[.]" Pierre, 502 F.3d at 117; see also Villegas, 523 F.3d at 988 ("Every other circuit to consider the question has concluded that 'torture' under the CAT requires specific intent to inflict harm.").[13]

In its thorough opinion in Auguste, the Third Circuit rejected a Haitian national's argument that indefinite detention under deplorable conditions amounted to torture. 395 F.3d at 152-54. Relying on the CAT's ratification history, the court found that the CAT contained a specific intent requirement, and that this requirement was carried into domestic law by the CAT's implementing regulations. Id. at 142. The court went on to affirm the BIA's adoption of a definition of specific intent that was "in accord with [the term's] ordinary meaning in American law." Id. at 145. The court noted that the Supreme Court has held that, in order to act with specific intent, an actor "must expressly intend to achieve the forbidden act." Id. (citing Carter v. United States, 530 U.S. 255, 269 (2000)). In the context of the CAT, this means a prospective torturer must have "the intent to commit the [torturous] act as well as the intent to achieve the consequences of the act, namely the infliction of the severe pain and suffering." Id. at 145-46. A showing that severe pain and suffering is

---

[13]Although the Pierre court noted that "there are wrinkles in the Third Circuit," 502 F.3d at 117 & n.3 (citing Lavira v. Att'y Gen. of the U.S., 478 F.3d 158 (3d Cir. 2007)), those "wrinkles" have since been resolved in favor of the BIA's position. See Pierre, 528 F.3d at 190 ("Moreover, to the extent that *Lavira* suggests that mere knowledge is sufficient for a showing of specific intent, we overrule that suggestion.").

foreseeable, but not intended, was held to be insufficient to establish specific intent. Id. at 146.

This formulation of the CAT's specific intent requirement was affirmed en banc by the Third Circuit in Pierre. 528 F.3d at 189. There, the petitioner did not dispute that the CAT contained a specific intent requirement. Id. Rather, the petitioner argued that the requirement was "satisfied by a showing that the Haitian officials have knowledge that severe pain or suffering is the practically certain outcome of his imprisonment." Id. The court disagreed, and affirmed the Auguste court's definition of specific intent as including "the intent to commit the act as well as the intent to achieve the consequences of the act." Id. (quoting Auguste, 395 F.3d at 145-46). The court elaborated:

> Specific intent requires not simply the general intent to accomplish an act with no particular end in mind, but the additional deliberate and conscious purpose of accomplishing a specific and prohibited result. Mere knowledge that a result is substantially certain to follow from one's actions is not sufficient to form the specific intent to torture. Knowledge that pain and suffering will be the certain outcome of conduct may be sufficient for a finding of general intent but it is not enough for a finding of specific intent.

Id.

Similarly, the Second Circuit has rejected an argument that "Haiti's indefinite detention of criminal deportees amounts to torture in light of the prevailing prison conditions," Pierre, 502 F.3d at 116, holding that the CAT's specific intent requirement "incorporates a criminal specific intent standard," id. at 118. This standard "requires that the actor intend the actual consequences of his conduct (as distinguished from the act that causes these consequences)." Id. The court declined to hold that specific intent can be established through "willful blindness" or "deliberate indifference," noting that those "concepts, which may bear on knowledge

-16-

to the extent they establish conscious avoidance, [cannot] without more demonstrate specific intent." Id. In distinguishing the CAT's specific intent requirement from a general intent requirement, the court noted that "[t]he President and Senate knew full well that they were construing a treaty designed to stop criminal conduct. We cannot ignore the word 'specifically' in the ratification understanding and the regulations, and we decline to give it a counter-intuitive spin." Id. (footnote omitted).

## C. Analysis

Our own analysis begins with the language of the CAT itself. Article 1 defines torture as "any act by which severe pain or suffering, whether physical or mental, is *intentionally* inflicted on a person" for a proscribed purpose. Art. 1(1), S. Treaty Doc. No. 100-20 (emphasis added). The understandings of this definition, articulated by both the President and the Senate, make clear that the "intentionally inflicted" requirement means "an act must be *specifically intended* to inflict severe physical or mental pain or suffering" to qualify as torture. S. Exec. Rep. No. 101-30, at 9, 36 (emphasis added). "Thus, we are presented with a situation where both the President and the Senate, the two institutions of the federal government with constitutional roles in the treaty-making process, agreed during the ratification stage that their understanding of the definition of torture contained in Article 1 of the [CAT] included a specific intent requirement." Auguste, 395 F.3d at 142. These understandings were carried into the domestic realm through FARRA and 8 C.F.R. § 208.18(a), which incorporate the CAT's definition of torture subject to the reservations, understandings, declarations, and provisos contained in the United States Senate resolution of ratification of the Convention. See FARRA § 2242; 8 C.F.R. § 208.18(a). Given such clear evidence, we find it beyond dispute that the CAT and its implementing regulations include a specific intent requirement. See also Restatement (Third) of the Foreign Relations Law of the United States § 314 cmt. d (1987) ("A treaty that is ratified or acceded to by the United States with a statement of understanding becomes effective in domestic law . . . subject to that understanding.").

We next turn to the substantive question of what this specific intent requirement means in the CAT context, and whether the BIA erred in defining specific intent with reference to its ordinary meaning in American law. Cherichel acknowledges that the CAT contains a specific intent requirement, but argues that it is satisfied if severe physical or mental pain or suffering is the foreseeable consequence of a deliberate act.

Specific intent is a term of art in American jurisprudence, well known to practitioners and law students alike. See Auguste, 395 F.3d at 145; United States v. Sawyer, 239 F.3d 31, 40 n.7 (1st Cir. 2001). Although the term is not always defined or applied consistently, see Joshua Dressler, Understanding Criminal Law § 10.06 (4th ed. 2006); 1 Wayne R. LaFave, Substantive Criminal Law § 5.2(e) (2d ed. 2003), under its usual definition, specific intent is "[t]he intent to accomplish the precise criminal act that one is later charged with," Black's Law Dictionary 882 (9th ed. 2009). This definition is used throughout criminal law. See, e.g., Carter, 530 U.S. at 269 (noting that specific intent requires an intent to achieve the prohibited act); Vacco v. Quill, 521 U.S. 793, 802-03 (1997) ("[T]he law distinguishes actions taken 'because of' a given end from actions taken 'in spite of' their unintended but foreseen consequences." (quoting Pers. Adm'r of Mass. v. Feeney, 442 U.S. 256, 279 (1979))); United States v. Bartlett, 856 F.2d 1071, 1078 n.9 (8th Cir. 1988) (quoting jury instructions that "[t]o establish specific intent the Government must prove that the Defendant knowingly did an act which the law forbids, purposefully intending to violate the law"); 21 Am. Jur. 2d Criminal Law § 119 (2008) (providing that specific intent "requires not simply the general intent to do the immediate act with no particular . . . end in mind, but the additional deliberate and conscious purpose or design of accomplishing a very specific and more remote result; mere knowledge that a result is substantially certain to follow from one's actions is not the same as the specific intent or desire to achieve that result"). This definition has been adopted by every circuit to address the issue of specific intent in the context of Haitian criminal deportees seeking CAT relief. See Villegas, 523 F.3d at 988.

-18-

In contrast, general intent is "intent to perform an act even though the actor does not desire the consequences that result[,]" and often "takes the form of recklessness . . . or negligence." Black's Law Dictionary, supra, at 882; see also LaFave, supra, § 5.2(e), at 355 ("[G]eneral intent is only the intention to make the bodily movement which constitutes the act which the crime requires." (quotation omitted)); 21 Am. Jur. 2d Criminal Law § 118. The two forms of intent are often contrasted against one another. For example, the Supreme Court has noted that "'purpose' corresponds loosely with the common-law concept of specific intent, while 'knowledge' corresponds loosely with the concept of general intent." United States v. Bailey, 444 U.S. 394, 405 (1980). The Carter Court used an example to help distinguish between general and specific intent:

> [A] person entered a bank and took money from a teller at gunpoint, but deliberately failed to make a quick getaway from the bank in the hope of being arrested so that he would be returned to prison and treated for alcoholism. Though this defendant knowingly engaged in the acts of using force and taking money (satisfying "general intent"), he did not intend permanently to deprive the bank of its possession of the money (failing to satisfy "specific intent").

Carter, 530 U.S. at 268 (citing United States v. Lewis, 628 F.2d 1276, 1279 (10th Cir. 1980)).

It is this definition of specific intent—where the actor must intend both the prohibited act and its prohibited consequences—that the BIA properly applied both in this case and in In re J-E-. Specific intent is a term of art with a well-known, oft-applied legal definition. The D.C. Circuit has eloquently noted that "[w]here Congress borrows a term of art in which is accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the meaning its uses conveys to the judicial mind, and in such a case, in the absence of a contrary direction, its use may be taken as satisfaction with widely accepted definitions and not a

-19-

departure from them." <u>United States v. Bailey</u>, 585 F.2d 1087, 1124 (D.C. Cir. 1978), <u>rev'd on other grounds</u>, 444 U.S. 394 (1980) (<u>citing</u> <u>Morissette v. United States</u>, 342 U.S. 246 (1952)); <u>see also</u> <u>Refling v. Burnet</u>, 47 F.2d 859, 861 (8th Cir. 1931) ("'Where words have acquired a well-understood meaning by judicial interpretation, it is to be presumed that they are used in that sense in a subsequent statute, unless the contrary clearly appears.'" (quoting <u>United States v. Trans-Missouri Freight Ass'n</u>, 58 F. 58, 67 (8th Cir. 1893))). We believe the same principle applies when interpreting regulations that incorporate the understandings of both the President and the Senate.

Therefore, we hold that the phrase "specifically intended" contains a specific intent standard, as that standard is used in American criminal law. This means that a petitioner may not obtain relief under the CAT unless he can show that his prospective torturer has the goal or intent of inflicting severe physical or mental pain or suffering upon him.[14] We reject the argument that a showing that pain or suffering is practically certain to occur can establish specific intent; that is not the law. As the <u>Pierre</u> court noted: "We cannot ignore the word 'specifically' in the ratification understanding and the regulations, and we decline to give it a counter-intuitive spin." 502 F.3d at 118. We also cannot ignore the phrase "specifically intended" in the CAT's implementing regulations, and we give it its ordinary meaning in American law.

---

[14]We are quick to note, however, that the element of specific intent is separate and distinguishable from the element of state acquiescence. The definition of torture in 8 C.F.R. § 208.18(a) makes clear that it is the *torturer* who must posses the specific intent to inflict severe physical or mental pain or suffering, not necessarily the state actor. Thus, where a private actor specifically intends to inflict such pain or suffering, a showing that "a government official is aware of the persecutor's conduct and intent and acquiesces in violation of the official's duty to intervene" can be sufficient to constitute torture under the CAT. <u>Pierre</u>, 502 F.3d at 118 (<u>citing</u> <u>Khouzam v. Ashcroft</u>, 361 F.3d 161, 171 (2d Cir. 2004)); <u>see also</u> 8 C.F.R. § 208.18(a)(7).

Our reading of the plain language of the CAT and its implementing regulations is not based on, but is confirmed by, the BIA's interpretation in In re J-E-. See Pierre, 502 F.3d at 119 ("The deference we owe to the BIA's analysis in *In re J-E-* simply confirms the understanding we derive from plain meaning."). In In re J-E-, the BIA engaged in the same analysis in which we have engaged here and simply applied the traditional meaning of "specific intent" to the CAT context. See 23 I. & N. Dec. at 301. Because we derive our holding from the plain language of the regulations, we express no opinion on Cherichel's argument that the BIA's interpretation of specific intent is not entitled to deference.[15]

Cherichel relies heavily upon our decision in Habtemicael v. Ashcroft, 370 F.3d 774 (8th Cir. 2004), for the proposition that, in the CAT context, the specific intent element is satisfied by a showing that severe physical or mental pain or suffering is the foreseeable consequence of a deliberate act. In Habtemicael, an Ethiopian national who had been conscripted for service in the Eritrean liberation movement sought asylum, withholding of removal, and protection under the CAT. Id. at 777. Habtemicael's CAT claim was based on his fear that if returned to Eritrea, "the government would persecute or torture him because of his ideological opposition to the [Eritrean People's Liberation Front], his escape [from an EPLF camp] in 1986 [during which two EPLF soldiers were killed], and his failure to make the payments required for expatriates to have an Eritrean identity card." Id. at 778. Following a hearing, the IJ found that any punishment Habtemicael received if returned to Eritrea,

---

[15]However, a number of courts have deferred to the BIA's interpretation of specific intent when examining the CAT and its implementing regulations. See, e.g., Pierre, 502 F.3d at 116 (noting that, because the CAT's implementing regulations were drawn by the DOJ pursuant to FARRA and incorporate the Senate's understandings, "this circumstance bespeaks more deference, not less: deference to the Senate's ratification understanding, deference to the framing of the regulations, and deference to an agency's interpretation of the regulations"); see also Auguste, 395 F.3d at 144-45 (discussing the amount of deference owed to "the BIA's interpretation of the specific intent standard").

including the death penalty, would be incidental to lawful sanctions and thus not torture under the CAT because "a government has authority to punish and even execute individuals who avoid conscription or desert military forces during wartime." Id. at 779. The BIA affirmed without opinion, and Habtemicael appealed. Id.

On appeal, we reversed the IJ's ruling on Habtemicael's CAT claim and "remand[ed] for further findings as to whether Habtemicael is more likely than not to suffer torture within the meaning of the Convention if returned to Eritrea." Id. at 783. We based this reversal on the IJ's failure to make "findings as to whether the EPLF had the status of a recognized government when Habtemicael was forced into its service." Id. at 781. If it did not, "then Habtemicael as a citizen of Ethiopia may have acted lawfully in escaping and defending himself against recapture," and "[t]he sanction of death might therefore be a violation of the [CAT]." Id. We then briefly discussed what Habtemicael would have to prove on remand before the IJ and stated that the "intent requirement [of the CAT] is satisfied if prolonged mental pain or suffering either is purposefully inflicted or is *the foreseeable consequence of a deliberate act*." Id. at 782 (emphasis added) (citing Zubeda v. Ashcroft, 333 F.3d 463, 473 (3d Cir. 2003)).[16]

Unsurprisingly, Cherichel seizes on this statement, arguing that in the Eighth Circuit—in contrast to every other circuit that has examined the issue—the CAT's specific intent requirement is satisfied by a showing that severe pain or suffering is merely foreseeable or "practically certain to follow from the actor's conduct, whatever his desire may be as to the result." (Pet'r Br. 11 (emphasis omitted).) We recognize

---

[16]In Zubeda v. Ashcroft, the BIA had denied the petition of a citizen of the Democratic Republic of Congo requesting asylum, withholding of deportation, and relief under Article 3 of the CAT. 333 F.3d 463, 465-66 (3d Cir. 2003). In vacating the BIA's decision and remanding to the IJ, the court stated that "[a]lthough the regulations require that severe pain or suffering be 'intentionally inflicted,' we do not interpret this as a 'specific intent' requirement." Id. at 473 (internal citation omitted).

-22-

that the language in <u>Habtemicael</u> is in conflict with our holding here that the CAT's specific intent standard can only be satisfied by proving that a persecutor has the goal or intent of inflicting severe physical or mental pain or suffering. However, we believe this portion of the <u>Habtemicael</u> decision to be dicta, and we decline to follow it. <u>See</u> <u>Passmore v. Astrue</u>, 533 F.3d 658, 661 (8th Cir. 2008) (noting that the court need not follow dicta, defined as "a judicial comment made while delivering a judicial opinion, but one that is unnecessary to the decision in the case and therefore not precedential" (quotation omitted)).

Our decision in <u>Habtemicael</u> was based on the IJ's failure to address the factual question of whether the EPLF had sovereign authority in 1986 such that any punishment that Habtemicael might receive upon returning to Eritrea would be a lawful sanction. <u>See</u> 370 F.3d at 781 ("The immigration judge made no findings as to whether the EPLF had the status of a recognized government when Habtemicael was forced into its service in Barentu or whether it had the authority to impress an Ethiopian citizen into military service against the Ethiopian government."). Such factual issues are not for this court to resolve. <u>Id.</u> ("[T]he extent of [the EPLF's] authority in 1985 and 1986 is a question for the immigration judge in the first instance, as is any legal consequence."). Thus, we remanded the case to the IJ for further fact-finding. <u>Id.</u> at 783. Our discussion of what Habtemicael would have to prove on remand was unnecessary to our resolution of the case, and no other panel of this court, or any other court, has relied upon it. Thus, we hold that the portion of <u>Habtemicael</u> discussing specific intent is dicta, and therefore not entitled to precedential effect. <u>See</u> <u>Passmore</u>, 533 F.3d at 661.

Additionally, we note that the language in <u>Zubeda</u>, upon which the <u>Habtemicael</u> court relied, has since been held to be dicta as well. <u>See</u> <u>Auguste</u>, 395 F.3d at 148 ("[W]e believe that the quoted passage of *Zubeda*, upon which Auguste relies, is dicta."); <u>see also</u> <u>Pierre</u>, 528 F.3d at 187 (acknowledging same). A similar fate has befallen <u>Lavira v. Attorney General</u>, 478 F.3d 158 (3d Cir. 2007). In <u>Lavira</u>, the court

stated that it could not "rule out that intent can be proven through evidence of willful blindness." Id. at 171. The Third Circuit, sitting en banc, has since overruled this interpretation of specific intent. See Pierre, 528 F.3d at 190 ("[T]o the extent that *Lavira* suggests that mere knowledge is sufficient for a showing of specific intent, we overrule that suggestion.").

Cherichel also relies upon a 2004 memorandum by the DOJ's Office of Legal Counsel (OLC) to support his argument that specific intent can be established by mere foreseeability. See Mem. from Daniel Levin, Acting Assistant Att'y Gen., to James B. Comey, Deputy Att'y Gen. (Dec. 20, 2004), available at http://www.justice.gov/olc/18usc23402340a2.htm [hereinafter 2004 OLC Memorandum]. The memorandum analyzes the legal standards applicable under 18 U.S.C. §§ 2340-2340A, which fulfill the United States' obligation under the CAT by criminalizing torture, defined as "an act committed by a person acting under the color of law specifically intended to inflict severe physical or mental pain or suffering." 18 U.S.C. § 2340(1). The memorandum addresses several issues, including the meaning of the terms "severe," "severe physical pain or suffering," and "severe mental pain or suffering." 2004 OLC Memorandum. Its final section discusses the meaning of "specifically intended," as used in the definition of torture in § 2340(1). Id. After noting inconsistencies in the way courts have interpreted general and specific intent, the memorandum finds that it is "not . . . useful to try to define the precise meaning of 'specific intent' in section 2340." Id. Citing "the President's directive that the United States not engage in torture," the memorandum suggests that "it would not be appropriate to rely on parsing the specific intent element of the statute to approve as lawful conduct that might otherwise amount to torture." Id. The memorandum specifically declines to reiterate the standard of specific intent previously articulated by the OLC, namely that the "infliction of severe pain or suffering be the defendant's 'precise objective.'" Id. n.27.

Cherichel argues that because the OLC suggests that, in the domestic context, specific intent can be proven by showing that severe pain or suffering was the foreseeable consequence of a deliberate act, we must apply a similar definition in the immigration context. By failing to do so, Cherichel claims that "the United States is holding its own interrogators to a higher standard than it holds the Haitian government in its treatment of criminal deportees." (Petr.'s Br. 19.)

Without expressing an opinion as to the amount of weight or deference due the 2004 OLC Memorandum,[17] we decline to adopt its reasoning. Our holding—that the CAT's specific intent element cannot be satisfied by a showing that severe physical or mental pain or suffering is merely foreseeable—is based on the plain language of the CAT, the understandings of the CAT expressed by the President and the Senate, and the language of the CAT's implementing regulations. That the OLC interprets the CAT's language differently, while perhaps relevant to our analysis, is certainly not determinative.

In sum, we reject the argument that the CAT's specific intent element can be satisfied by a showing that severe physical or mental pain or suffering is merely the foreseeable consequence of a deliberate action. We hold that the definition of torture under the CAT and its implementing regulations contains a specific intent element, which is satisfied only by a showing that a persecutor specifically intends to inflict

---

[17]We note, however, that while OLC opinions are generally binding on the Executive branch, see Public Citizen v. Burke, 655 F. Supp. 318, 321-22 (D.D.C. 1987), the courts are not bound by them, see id.

severe pain or suffering upon his victim.[18]  This was the definition properly applied by the BIA in this case.

IV.

Having determined that the BIA applied the correct legal definition of specific intent, we must affirm the BIA's decision.  Because Cherichel was ordered removed as having committed a drug offense, our jurisdiction is limited to constitutional issues and questions of law.  8 U.S.C. § 1252(a)(2)(C), (D).  Factual determinations lie outside our scope of review and, to the extent that Cherichel argues that the BIA incorrectly held that he failed to prove specific intent under the standard announced today, we lack the jurisdiction to reweigh the evidence before the BIA.  See 8 U.S.C. § 1252(a)(2)(D); see also Lovan v. Holder, 574 F.3d 990, 998 (8th Cir. 2009) (holding that a challenge to the BIA's factual determinations is beyond our jurisdiction); Mocevic v. Mukasey, 529 F.3d 814, 817 (8th Cir. 2008) (per curiam) (declining to review petitioner's claims for asylum, withholding of removal, and CAT relief because the petition amounted to "nothing more than a challenge to the IJ's discretionary and fact-finding exercises cloaked as a question of law") (quotations omitted). Because Cherichel failed to prove that Haitian authorities have the specific intent to inflict severe pain or suffering when imprisoning criminal deportees, he cannot prove that it is more likely than not that he will be tortured if returned to Haiti.

Nothing in our holding today is meant to minimize the deplorable, often inhuman conditions that exist in many Haitian prisons and police stations. The

---

[18]We note that we are not holding that deplorable prison conditions can never constitute torture or that an alien can never receive CAT protection based solely on evidence of such conditions.  Where a petitioner can prove that authorities place prisoners in deplorable conditions with the specific intent to inflict severe physical or mental pain or suffering, such actions can rise to the level of torture if the other requirements of the CAT are satisfied.

evidence adduced by Cherichel before the IJ shows that Haitian prisoners and criminal deportees are held in squalid, overcrowded cells without adequate food, water, sanitation, exercise, or medical treatment. "[D]etainees and other prisoners face a brutal existence, experiencing pain and suffering on a daily basis." Auguste, 395 F.3d at 154. We sympathize with Cherichel and others who must face such terrible conditions. However, we are bound to apply the definition of torture in the CAT and its implementing regulations. These conditions, although deplorable, do not rise to the level of torture in this case because Cherichel failed to establish that Haitian authorities have the specific intent to inflict severe physical or mental pain or suffering. As such, the conditions cannot form a basis for CAT relief.

For the foregoing reasons, we deny the petition for review.

_____